LANDRY, Judge.
This appeal by Henderson Properties, Inc. (Appellant) is from the judgment of the trial court awarding Appellant compensation in the sum of $339,440.00 for^a portion of a housing project owned by Appellant and expropriated by the Department of Highways (Department) for construction of Interstate Highway 10 in the City of Baton Rouge. Appellant alleges the trial court erred in granting inadequate compensation and assessing Appellant with costs. Alternatively, Appellant argues the trial court erred in failing to average the appraisals of Appellant’s chief expert, Le-jeune, and the Department’s principal expert, Driggers. We affirm.
Subject property, known as Delmont Gardens Project, is a post World War II, low rental housing project, constructed in approximately 1949 or 1950, comprising 31.585 acres upon which were situated a total of 393 mass produced units, consisting of 65 singles and 164 duplexes, before the taking. The expropriation involved a strip containing 211,807 square feet of land containing 7 single units and 32 double buildings, a total of 71 rental monads. The highway right of way traverses subject property from north to south leaving a westerly remainder containing 15 rental and an easterly remainder containing 307 units. The remaining parcels, though separated by the elevated expressway, are connected by Kelvin Street which remains open beneath the raised highway. Riley Street, which formerly connected the remaining areas, has been closed. However, Kelvin and Riley Streets are now connected by a street known as a return of traffic street.
The expert witnesses engaged by the respective parties agree that the land is worth $0.60 per square foot, and that the part actually taken has a value of $127,085.00. They also agree that the best and highest use of subject property is its present use, namely, multiple housing. They likewise agree that a lack of compa-rables dictates using the income approach method of valuation as the most reasonable and logical formula for determining just compensation in this instance.
The Department calculated just compensation at $339,400.00 consisting of $127,085.00 for land, $199,310.00 for improvements, and $13,045.00 severance damages. Appellant claims total compensation of $513,830.00. The trial court awarded the Department’s figure. The only remaining dispute concerns the amounts awarded for improvements and severance damages.
The Department produced two experts, Chester Driggers and J. A. Bahlinger, III, whereas Appellants offered Lloyd J. Rock-hold and John Lejeune, all of whom used the income approach method of valuation except Rockhold who utilized cost reproduction. The trial court accepted Drig-gers’ testimony upon finding that his percentage estimates for depreciation, management expense, interest, and vacancy and credit loss appeared to be well founded and the most reasonable of all the experts.
Appellant contends the trial court erred in relying entirely on Driggers’ testimony and rejecting that of Lejeune. Basically, it is urged that Lejeune’s expense factors should have been accepted because they were based on Appellant’s records showing actual costs of various items whereas Drig-ger’s expense estimates were based entirely on his individual experience and personal judgment. Alternatively, Appellant urges that the trial court erred in failing to average the appraisals of Driggers and Lejeune and suggests correction of an alleged mathematical error in Driggers’ computations. Finally, Appellant complains of its being taxed with costs.
Driggers’ testified the project is a mul-ti-family housing project constructed subsequent to World War II and financed by the Federal Housing Authority (FHA). *350 The project consisted of 393 identically constructed dwelling units, excepting that some were built as a single unit whereas others consisted of two units joined together to form a duplex. He used both the cost and income approach in reaching his valuations but relied principally upon the income approach as the best indication of value. As did the other experts, Driggers valued the land at $0.60 per square foot or $825,510.00 for the whole tract. In using the income approach, he computed gross annual rental income by multiplying the monthly rental of $67.50 received for the single units by the number of such units, namely 65, and arrived at a monthly income from this source of $4,387.50, or $52,650.00 per annum. Since the duplex units rented for $62.50 monthly, he noted that these provided monthly income of $20,500.00, or $246,000.00 annually, giving a gross annual economic rental of $298,650.00. From this total, Driggers subtracted 11% which he estimated would be lost from vacancies and credit losses, that is, loss of rentals accrued, but not collected. This loss amounting to $32,850.00 was deducted from the gross economic rental, leaving $265,800.00 described as effective gross annual income.
From the effective gross, Driggers subtracted expenses considered as general operating charges. These included the following: (1) 7'% of the effective gross for management amounting to $18,606.00; (2) 8% of the gross (maintenance and repairs), $23,892.00, and (3) a reserve for replacement cost in the sum of $3.00 monthly per unit, or an annual cost of $14,148.00. In addition, fixed annual expenses of $5,425.00 for insurance and $23,975.00 for real estate taxes were included. The total of these expenses, $86,046.00, were deducted from effective gross income leaving a net income from the property of $179,754.00 before capital recapture. From this latter figure, Drig-gers deducted the then current interest rate of 7% of the value of the land ($825,510.-00) or $57,786.00, leaving a net income attributable to the improvements in the sum of $121,968.00. Net improvement income was then divided by an overall capitalization rate of 11% consisting of 7% interest and 4% depreciation considering Driggers felt the improvements had a remaining life of 25 years. This computation produced a figure of $1,108,800.00, which Driggers deemed the value of the improvements to which he added the agreed value of the land, $825,500.00, giving the tract a total value of $1,934,310.00 prior to the taking.
The value of the land taken was appraised by Driggers at the agreed price of $0.60 per square foot or $127,085.00. The improvements taken were valued by obtaining a factor by dividing the rate of each single and duplex unit into the monthly rental of each such unit. Using these factors and the $1,108,800.00 total value of the improvements, he fixed the value of a single family unit at $3,010.00, and an individual duplex unit at $2,785.00, or $5,570.00 for each duplex building. In this fashion, he found the total value of the 7 single and 32 duplexes taken amounted to $199,310.00.
Driggers then computed severance damages in essentially the same manner used to value the entire project. He determined gross rentals of the remaining 58 single and 264 double units at $20,415.00 monthly, or $244,980.00 yearly. He estimated future taxes at $19,710.00 and insurance at $4,445.00. Using 10% as a vacancy and credit loss factor, he determined this cost to be $24,498.00 annually. Repairs and maintenance were estimated at 8% of the gross, or $19,598.00. To these expenses, Driggers added 8% of the effective gross $17,638.00, and $3.00 for each of the remaining units as reserve for replacement, $11,592.00. The total of these expenses, together with 7% of $698,425.00 (the capitalized value of the remaining land), or $48,890.00, was then subtracted from the rental income leaving a net rental income attributable to improvements in the sum of $98,609.00. Applying an 11% factor (7% for interest and 4% for depreciation) to the $98,609.00 net income attributable to improvements, Driggers found the remain *351 ing improvements were worth $896,445.00. To this latter figure, Driggers added the value of the remaining land, $698,425.00, thus establishing the value of the remainder in the sum of $1,594,870.00. To determine severance damages, Driggers ascertained the value of the remainder before the taking by subtracting the value of the land and improvements taken from the value of the whole before the taking which showed a value of $1,607,915.00 to the remainder before the taking. From this figure, he subtracted $1,594,870.00 (the value of the remainder after the taking) and found severance damages in the sum of $13,045.00.
Using the cost of reproduction approach primarily as a check on the accuracy of his income approach, Driggers concluded the total project was worth $2,035,000.00. He concluded the units could be reproduced at a base price of $5,900.00, or $2,318,700.00 for a total of 393 units. The buildings, though 18 years old and estimated by FHA to have a 50 year life, Driggers considered to have a remaining life of only 25 years. He explained that by the nature of the construction, a certain amount of obsolescence or depreciation was built into the project upon its construction. He therefore depreciated the value of the buildings 50%, leaving a building value of $1,159,350.00. To this he added $51,090.00 for additional work he felt was needed (concrete and clothes poles) and also the value of the land, $825,510.00, arriving at a cost reproduction value of $2,035,950.00.
Driggers justified his use of an 11% factor for vacancy and credit loss, in contrast to lesser figures used by ' other appraisers, on the ground that his experience showed his factor to be reasonable for a project of this nature, and also on the basis that, in his judgment, use of a smaller figure in this regard could imperil the success of a financial venture of this character. Despite the showing that the project had at one time enjoyed 100% occupancy, Driggers felt his 89% occupancy and credit loss estimation was reasonable over the entire life of the project. He acknowledged that some realty managers charged a standard 5% fee for managing such projects but explained that his 7% figure included items not normally included in such management contracts. He referred to such costs as special accounting and reports required by the FHA which were not involved in projects otherwise financed. Driggers also acknowledged his estimate of management cost as well as his 8% estimate for maintenance and repair was based on his experience with a similar project in another city. He likewise acknowledged his computation did not consider the income that could be derived from investment of the reserve accumulated for replacement. Driggers conceded estimates for maintenance, repair and management expense could vary among appraisers and businessmen, but that he believed his own estimates to be reasonable in view of his knowledge and experience. He defended his capitalization rate of 7% on the ground that, in his judgment, a lesser rate of 6i/¿% utilized by other appraisers was too low for a project of this nature. As previously noted, he defended his 4% depreciation rate on the ground that the buildings had a remaining life of only 25 years due to built in obsolescence from the beginning.
Appellant’s expert, Lejeune, noted he had extensive experience in selling and operating apartment complexes in the Baton Rouge area. He likewise used both the cost and income approach, but relied chiefly upon his values determined by employing the income approach. Lejeune commenced with gross income in the sum of $298,650.00 derived in the same manner employed by Driggers. From this sum, he deducted 7% ($20,906.00) for vacancy and credit loss, based on the fact that the Appellant’s records showed a 90 to 100% occupancy during the past few years. This produced an effective gross of $277,750.00. From this figure, he deducted 5% of the effective gross of $13,888.00 for manage *352 ment cost which is what he was then paying on a project of his own. He also deducted the same amount for maintenance and repairs, together with $5,685.00 for insurance, $23,975.00 for property taxes and $18,000.00 for reserve for replacements. His deductible expenses of $75,436.00 left a net income of $202,314.00 before capital recapture. Similar to Driggers, Lejeune did not consider the income that could be produced by investment of replacement reserve. Also like Driggers, Lejeune capitalized land value at 7% of $57,786.00. This left a net income of $144,529.00 attributable to improvements. Unlike Drig-gers, however Lejeune capitalized improvements at 91/2% which included a 3% depreciation rate based on remaining economic life of 33 years. Applying his 9i/¿% factor to the value of improvements ($144,529.00) Lejeune determined the value of the buildings to be $1,521,350.00, which added to the $825,500.00 value of the land produced a total value of $2,346,850.00 before the taking. Based on calculations similar to Driggers’, Lejeune fixed the value of the single rental units at $4,212.-00 each and the duplexes at $3,800.00 per unit. Therefore, he found the value of the 7 singles taken to be $29,484.00 and the 32 doubles (64 units) at $243,200.00. These figures, added to the $127,085.00 value of the land taken, fixed the value of the part taken at $399,769.00 which Lejeune rounded out to $400,000.00. Based purely on his own opinion that the rental value of the units west of the expressway would reduce by $12.50 monthly following the taking, he determined severance damages were due for this remainder in the sum of $28,264.-00. He arrived at this figure by noting that the rental loss from these units would amount to $2,100.00 annually, which discounted at 6^/2% over the remaining 33 years of the project would have a value of $28,264.00. It was Lejeune’s opinion that this reduction in rental would result chiefly from noise generated by traffic on the expressway. Adding his estimate of severance damages to his appraisal of the property taken, Lejeune fixed total compensation in the sum of $428,264.00.
The Department’s witness, Julius A. Bahlinger, III, valued subject property using both the cost and income approaches. It suffices he relied mainly on his income approach in which he employed substantially the same procedure adopted by Driggers and Lejeune. Some of his percentage factors varied, however, based primarily upon his individual experience and his personal assessment of the nature and remaining economic life of the improvements. Bah-linger appraised the property taken at $311,023.00, and severance damages at $21,400.00, a total of $332,423.00.
Appellant’s witness, Lloyd Rockhold, a professional cost estimator, determined that reproduction costs would amount to $2,579,482.00. He did not attempt to estimate the remaining economic life of the improvements, but opined the buildings should last 50 years from construction date, if properly maintained.
In contending the lower court erred in rejecting Lejeune’s testimony in favor of that of Driggers, Appellant relies upon certain well established principles applicable in cases of this nature. Among these are the rule that consideration must be given the testimony of all experts whose valuations are founded on sound reasoning and judgment. Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541.
 Equally pertinent is the rule that where findings of fact are involved, the determinations of a trial court will not be disturbed unless shown to be manifestly erroneous. State Through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20; State Through Department of Highways v. Christ Baptist Church, La.App., *353 197 So.2d 83. Much discretion is granted a trial judge in the evaluation and weighing of expert testimony in expropriation proceedings and his findings of fact based on their testimony will not be disturbed unless found to be clearly erroneous.
It is readily apparent that both Lejeune and Driggers conceded the variables they used in determining value on the income approach basis were judgment factors concerning which reasonable men might differ. Lejeune’s 7% vacancy and credit loss was based on his study of the records of subject project for the past several years preceding the taking. It is significant, however, that when questioned concerning a prior report made to Appellant, in which Lejeune reputedly used a 10% vacancy factor, he stated he did not recall such a report, but also said that if counsel for Ap-pellee stated such a figure had been used, Lejeune felt it was true. He further acknowledged having made a prior report, and was unable to account for his failure to find a copy thereof in his file. In contrast, Driggers used an 11% vacancy factor which he deemed reasonable in view of the nature of the project. In accepting Driggers’ figure, the trial court unquestionably gave some consideration to the fact that at one time Lejeune considered a 10% vacancy factor reasonable.
Driggers justified his 7% management cost (as opposed to Lejeune’s 5%) primarily on the fact that an FHA project would require considerably more record keeping and filing of report forms than similar projects not likewise financed. Additionally, Driggers provided for a resident manager with a salary and rent free dwelling unit which he considered necessary for a project of this size. Considering judgment factors were involved in the testimony of the experts, we cannot, under the circumstances, find that the trial court manifestly erred in accepting Driggers’ computations in preference to Lejeune’s.
Appellant is mistaken in contending that Driggers mathematically erred in computing 8% of the effective gross as $23,892.00 in deducting charges for maintenance and repairs. Driggers’ testimony is that he took 8% of the entire gross ($298,650.00) which, according to our own calculation is $23,892.00, the figure actually used by Driggers.
Lejeune’s $18,000.00 annual reserve provided for the cost of a resident manager. Driggers previously allowed for a resident manager in his 7% management cost, consequently, eliminating this difference, the computations of the two experts for reserves would appear to be substantially alike. As regards insurance costs, Lejeune used the actual amount being paid at the time of taking, namely, $5,685.00, whereas, Driggers used $5,425.00, a difference of $260.00 annually, which we deem inconsequential.
The final difference was between Drig-gers’ capitalization rate of 11%, which allowed 7% for interest and 4% for depreciation, and Lejeune’s rate of 9.5% composed of interest at 6.5% and depreciation of 3%. Both conceded value judgments were involved concerning which reasonable men might differ. Lejeune predicated his interest rate chiefly on the fact that the project enjoyed a favorable 4.5% finance. He based his 3% depreciation factor on his estimation of a 33 year remaining economic life of the project. Driggers, however, estimated remaining economic life at 25 years, hence his 4% depreciation figure, based on the type of structures involved. Lejeune based his depreciation factor chiefly on the fact that the financing authority, FHA, initially estimated economic life at 50 years. Photographs introduced in evidence showing the condition of the buildings and the nature of their construction fails to indicate manifest error on the part of the trial court in accepting Driggers’ estimate of their remaining economic life.
*354 Appellant argues that greater weight should be given Lejeune’s testimony on the ground that Lejeune was from Baton Rouge whereas Driggers was from another community. While this might be true under some circumstances, it does not necessarily follow. This latter factor aside, Driggers’ experience and background in the field appears equal to that of Lejeune. Significantly, it does not appear that the projects managed by Lejeune in the Baton Rouge area involve construction substantially similar to that involved in subject project.
Appellant’s alternative contention that the appraisals of Driggers and Le-jeune should be averaged is without merit. Averaging appraisals has been expressly proscribed as a method of determining just compensation in expropriation proceedings. State Through Department of Highways v. Baddock, La.App., 160 So.2d 279.
The trial court properly assessed all costs, including appraisers’ fees, against Appellant. As a general rule, the state and its subdivisions are exempt from payment of all costs save stenographer’s fees. LSA-R.S. 13:4521. This rule, however, does not apply in expropriation cases where the state has failed to tender the true value of land taken before proceedings are commenced. In expropriation proceedings, if the governmental expropriating authority tenders the correct value of the land before the taking, it is not liable for the owner’s costs. State Through Department of Highways v. Barineau, 225 La. 341, 72 So.2d 869; LSA-R.S. 19:12. The same rule applies in a taking under the so-called “Quick Taking Statute” where the expropriator deposits in the court the true value of the land taken and all severance damages due the owner. State Through Department of Highways v. Rivers, La.App., 242 So.2d 916.
The judgment of the trial court is affirmed at Appellant’s cost.
Affirmed.